Guthrie v. Coal Bed Services, 24-10572. All right, so we've got Ms. McGinley here for the appellant, along with Benamikas, Ms. Gantz, and for the appellee, Mr. Smith. All right, so it looks like you guys, you're going to argue 7, then 5, then 15, then 3, correct? That's correct. Very well. Fire away. Thank you, Your Honor. May it please the Court. My name is Rachel McGinley, and I am here on behalf of Plaintiffs DeMarcus Hall and Eddie Hughes. This Court should reverse the District Court's decision in this case, which granted summary judgment on plaintiffs' claims of disparate treatment based on race and their claims of retaliation. Plaintiffs DeMarcus Hall and Eddie Hughes presented enough evidence for a reasonable jury to infer that illegal discrimination and retaliation occurred. The District Court approached the question of whether genuine disputes of material fact existed for each claim using both McDonnell Douglas and the convention mosaic analysis. However, under each approach, the District Court's legal analysis was flawed, and it failed to review the facts in light most favorable to the plaintiff. There are four legal errors that plaintiffs believe are most important for this Court to correct. First is the District Court's failure to appropriately apply the comparator standards set forth in Lewis v. Union City. Second is the District Court's assessment of defendants' burden to produce evidence of a legitimate nondiscriminatory reason for its adverse actions. Third is the scope of evidence the District Court considered in evaluating the convincing mosaic or Rule 56 approach. The fourth is the assessment of the causal connection in plaintiff's retaliation claim. Would you mind talking about convincing mosaic first? I would love to talk about convincing mosaic first. Seems like it at least has the possibility of eliding a lot of difficulty. I agree, Your Honor. And in this case, the District Court made several errors in plaintiff's view of the evaluation of the evidence. The first was the fact that the District Court failed to consider comparator evidence as part of the convincing mosaic. Initially, through the McDonnell Douglas prima facie case analysis, the District Court determined that Brandon Ramsey, who was a white coworker of the plaintiff's and who had not complained about different treatment, the District Court found that he was not a comparator under the McDonnell Douglas standard. And for that reason, the District Court decided that it could not consider evidence related to Brandon Ramsey as part of plaintiff's convincing mosaic of circumstantial evidence that would allow them to move forward to trial. This conflicts with the District Court's precedent. There are many cases that have come into play where You mean this Court's precedent? Correct. Yes, Your Honor. I'm sorry. The 11th Circuit precedent Lewis v. Union City is a perfect example of this, even though at the initial McDonnell Douglas phase, Lewis' comparators, the people that she put forth as comparators, were not sufficient to meet her burden under the McDonnell Douglas standard. This Court found later on review of the convincing mosaic standard that those individuals were still important for determining as a whole whether or not the plaintiff had presented sufficient evidence of discrimination. Partially comparable is basically what you're talking about. Yes, similar. Not similarly situated necessarily in all material respects, although plaintiffs do believe that Brandon Ramsey is similarly situated in all material respects. Of course, it depends on what you mean by material. If a material aspect is how long you've been serving for the company and what kind of job you've done while you're there and how many trucks you've wrecked or equipment you've wrecked, then it's not. Correct, Your Honor. I think materiality is a really important word in Lewis and in this case. In the Rule 56 context, not all facts are material or of consequence for a particular decision. I think the same is true when you use the word in trying to determine whether or not a comparator is appropriate. I think the ways that facts can become of consequence are important here. One way is certainly that there could be a written policy. A written policy could set out specific details or differences or qualities of employees that are material for a decision at issue. Another way that a fact could become of consequence is that a decision maker testifies that it is of consequence. It mattered to me when I made the decision. And that is really important in this case because the two decision makers who testified, plaintiff's direct supervisor, Willie Williams, and the next level up, Stan Pate, who was also the 30B6 representative for both defendants in this case, both men testified that they would have allowed plaintiffs back to work had they simply agreed to the same conditions as their white comparator, Brandon Ramsey. There is no testimony that they considered construction experience, that they considered construction experience, and are you willing to agree to these conditions. Plaintiffs in this case say that they were willing to agree. I think we have good evidence of their, the way they showed their interest. More importantly, that they tried to convey that. Exactly, Your Honor. They sent text messages. They made calls. And that's just, your position is that's just a classic swearing match while we have juries. Exactly. Yes, Your Honor. There's other evidence of the convincing mosaic, not just the comparator evidence, although I do believe that is our strongest piece of evidence in this case. But plaintiffs did testify to other instances of discrimination. They talked about, for example, not being called by their names, instead being called y'all or them or boy. They also testified to their experience of being given dirtier or harder jobs and talked about why that experience made them feel like it was based on race. And it wasn't just one. But that works. If we're putting Ramsey aside, that works only in regard to the other members of the crew that were on the job duty level that the plaintiffs were. Well, secondly, I would disagree. I would say that it would be part of a convincing mosaic because a reasonable jury could infer from those instances that this was a workplace that tolerated people being treated differently based on race and that it occurred when supervisors... I thought you were talking about different job duties. Oh, no, sir. I was talking, and my words may not have been very precise at all. What I was trying to point to was instances where the plaintiffs had testified that they felt that they were given jobs that were worse than other employees, specifically white employees, because of their race. But did they testify than other white employees at the same job level that we were working? Same pay grade, same experience, et cetera? I believe it's a little unclear, but I would say yes. I do think that because they testified to all white workers and there were other white laborers on the job, I see my time is up. Okay, very well. Let's hear from the government. Azumikis. May it please the court. Julie Gahan on behalf of the EEOC. I just wanted to... Could I turn to just what is material? In this case, it's what was material to the decision that was made, and different experience or seniority could very well be material in like a pay case or a promotion case. But here, the only reason given for treating Ramsey more favorably than Hall and Hughes was because Hall and Hughes allegedly would not agree to the same conditions to be drug tested and get clean. But because both plaintiffs disputed that they were ever given that opportunity and testified adamantly that they were not, as well as the text messages and the fact that he testified that he met Hall in the office where Williams did not mention that. So there's ample evidence from which a jury could disbelieve that reason. So if you take that difference away, Ramsey and Hall and Hughes are similarly situated in all material respects. And so I think what happened here is the district court found that there was no prima facie case because there wasn't an adequate comparator and then excised that critical evidence from its review of the convincing mosaic evidence. And that is a problem with starting with the McDonnell Douglas prima facie case when each element becomes its own standard of liability because the court focused on putting it in a certain box instead of looking at the evidence as a whole. So if the prima facie case just switches the burden to the defendant to produce a reason for its action, which it did here. So the only question is did the company refuse to rehire Hall and Hughes because of their race? And the question is how to get at intent when it's hard to find evidence of that. So we... Let me ask you this. So I'll just say I've had maybe five or six cases where the EEOC has filed a brief and they've always been really, really good and very, very helpful. So I very much appreciate you doing that. In this case, you make both the comparator argument that you're making and also the whatever the circumstantial evidence or convincing mosaic is the word. So you're filing a brief in this case because you're interested in these plaintiffs, but you're also interested in sort of these legal issues. Do we need to address the comparator issue here or should we go straight to convincing mosaic? Does it really matter for the development of the law and from the EEOC's perspective on that? Let's just assume we're going to rule in favor of the plaintiffs. What kind of opinion would we need to write on which issue? You certainly aren't required to reach that issue. You can decide the case just on convincing mosaic. But because we see all over the country in every circuit, courts that do apply the McDonnell-Douglas standard in this I would say formalistic way, our interest in having you address the application of these facts to Lewis is just to guide courts who do want to use McDonnell-Douglas, which really is only a place to start if the defendant hasn't come forward with a legitimate non-discriminatory reason, which almost never happens. So you're absolutely correct that you don't have to reach it. We would appreciate the guidance from this court on Lewis just because courts do really like McDonnell-Douglas. On that issue on the McDonnell-Douglas, let me just push you a little bit on the comparator argument then. So the comparator aspect of it is a step one question, right? Correct. So the defendant, when you're at step one, doesn't need to explain why they made the decision that they made, right? That's the point of the prima facie case is to shift the burden. Right. But the way you seem to be analyzing materiality is you kind of have to know why the defendant did what it did to determine whether the comparison is material. Well, that's a good point, Your Honor, and it's also We'll just assume that I only make good points. I really am struggling with this. I understand that material means something, but it can't mean at step one of McDonnell-Douglas, we've got to figure out why the defendant did what it did and then decide whether this was material because we're not at the point where the defendant has to tell us why it did what it did. Well, this perfectly illustrates why McDonnell-Douglas in the prima facie case doesn't really work on summary judgment because by the time you get to summary judgment, you already know what the decision is. And as you well know, and certainly Judge Newsom has written about this, the McDonnell-Douglas wasn't a summary judgment case and all the interpretations, the Supreme Court's interpretations of McDonnell-Douglas are not, have been bench trial cases. And even the Lewis governing legal standard is in some tension with this idea that it's a non-onerous light burden at the prima facie case stage. But yet we are at summary judgment and employers, especially in cases where they have submitted a position statement to the EEOC, they've already made, they've already said a lot about what they've done. So as far as materiality, I guess I think of it as, was it important to this decision and could a jury infer that, well, are you treating apples like apples or is there a reason to distinguish these two, or sorry, the plaintiffs with the white comparator? And here they're really, they're absolutely the same. And it's actually pretty unusual to have such a close match where they did the exact same misconduct on the same day. They even testified that they didn't want to take the test for the same reason, that they hadn't been, because of, you know, worried about failing it. And then, you know, they have the same supervisor, they are on the same job site. So everything about this is really a perfect match. And it's certainly an employer can prefer someone with more experience who's been there longer and value that person more. But there's no, nothing in this record that suggests that that had anything to do with the decision not to rehire the plaintiffs, but to rehire Ramsey. The, I think it was, Faith interjected into an answer that, no, we were looking for good people. This was during the pandemic. Right. Or I think you said during COVID, whatever. Does that weigh into the mosaic? How does that cut? The convincing mosaic analysis look, or metaphor, let's call it a metaphor. I'm a fan of Judge Grant's opinion, where she said, look, this is just summary judgment. You consider everything. Right. It's just evidence. You think that, the framework drops out, as we all know, at trial anyway. So look at the evidence. It goes to the jury. If the jury could decide this in favor of the plaintiffs, then that's a convincing mosaic. Correct. It's almost as if you look at it as a directed verdict issue at the end of the trial. So what I'm saying is, how does the fact that Pate says, oh no, we were looking for people. We were short. Everybody's staying at home wearing masks and all that stuff. Well, again, that goes to the credibility of the reason of Pate said that he would, I think he even testified, I would hire Hall back today. That it goes to the credibility of whether he actually did give them that opportunity or not. And the fact that it was hard to find people during COVID, which I'm sure was true. Maybe I'm just convinced. I thought that the argument at least was they never ask and Ramsey asked. They both testified. Both testified, but I thought the defendant's argument was they never asked. Well, that is disputed. I got it. And their text messages showing that both of them immediately got in touch with Williams. I understand. Which weighs entirely in the plaintiff's favor. Correct. So it would be up to the jury whether they believe Pate's testimony or whether they believe the plaintiff. So at this stage, the facts have to be taken in the light most favorable to Hall and Hughes. Thank you very much. All right, Mr. Smith. Yes, sir. May it please the court. Jeff Smith for Colvin and Pate. I'd like to jump right into that argument if we can. The issue here at summary judgment is did they establish their crime of facial case? Did they create a convincing mosaic? And so what they're trying to do is use evidence that favors them and favors us at the same time. And they can't do that. And my point is this. When they say, oh, on one hand, we were discriminated against because we never were offered the opportunity to come back. That's the essence of their claim is that this other person, Ramsey, was allowed to come back. We were not. But then they also want to argue that we did offer them the opportunity to come back. That has always been our position since the EEOC stage. I'm sorry. I'm sorry. When are they arguing that they were offered and turned down the opportunity to come back? Well, when she goes through the analysis of why they were not offered the opportunity to come back because Ramsey had different characteristics and that goes to the convincing mosaic as to why they were not offered their job back, it just doesn't make any sense. So the facts are at this stage, we have to assume that they were not offered the job back absent some condition and the dispute is about whether or not they met the condition. Namely, like, we'll take a drug test. The way I understand it is they were not offered the job back, period, was their position. Our position has always maintained that they were offered their job back and they were offered the same. But is there, regardless of what the position is now, is there evidence in the record viewed in light most favorable to the plaintiffs that they weren't offered the job back? Well, their testimony. That will get you across the goal line in most summary judgment cases. If we assume that to be true, that they were not offered their job back, then we have to look at compared to who. If you look at the comparator score analysis, I think what they want to gloss over are two critical facts. One is that they have to be so similar and I think the court Back to the McDonnell Douglas framework. I understand the strongest part of their argument to be we don't have to do diddly about the comparator, but anything we do about the comparator weighs into the mosaic. I mean, if somebody is mistreated from the get-go and there is evidence that the decision makers are racist, maybe not this particular transaction that got the people to lose their job and not be rehired and all that, that can get you across. And you don't have to have a those incidents that they complain of, every single one of them are race neutral. The court would give me just a second to go through them. We're segregated. We got the worst jobs. They're the laborers. They're the newest people on the crew. Were the white employees called boy? I don't know that there was ever anything in the record here where they were called boy. Were the white workers asked to wash Mr. Toxie's truck during working hours? I don't know that there was a record of that, but I'd like to address that. So what happened in that incident when I pressed Mr. Hughes, he had the best testimony about this. They're pressure washing a piece of equipment. Mr. Toxie was the acting supervisor that day. He pulls up in a company truck and says, hey, you're going to wash my truck next. They took that offense to that and they said, oh, you know, there was a dust up over that, whatever. And when I pressed him, I said, well, did he use any offensive names or any offensive language? And Mr. Hughes emphatically said no. So there was no racial element to that. When they reported that to Mr. Williams and they complained about it and said he's racist, Mr. Williams pressed him and said, hey, what do you mean? Give me some examples. And they said, we just don't like the way he treats us. There was no example of any racial name calling or anything like that. And what I want to point to the court is if you look at this record, if you compare it to other cases, there is no evidence of any, anywhere in the workplace, racial name calling. They couldn't point to a single comparator and say, oh, the other white employees. What other white employees? They're the only laborers there. There were four laborers, three African American and one white, but they didn't point out that Mr. Goff got a different job than they did. They just make these generalized statements. There's no evidence of anything in the workplace. And I was quite frankly shocked. Let me ask you this. When Ramsey came back from his little dust up, was he paid for the full day or half day? Ramsey, you're talking about the drug thing? He was paid for the full day. What were they paid? I don't know. Half day. But they were fired. They didn't come back to work. He was fired and came back. I know, but they didn't come back. They didn't come back. Our position was always that they were offered the opportunity and they turned it down. Mr. Pate testified, and this is where we get into, at the first stage of summary judgment, assuming they were not offered their job back, then the analysis would be, is Ramsey comparable to them? And this court has said that they have to be so similar that they cannot reasonably be distinguished. You have a multi-year experience operator at a different pay rate, supervisor responsibilities. I don't see how you can compare the two. I'd submit to you that sometimes the most effective advocacy is to address the strongest part of their argument. And as I understand it, they've basically said, wink, wink, not done, put aside the McDonald-Douglas framework. That's not our strongest case. Our strongest case is when you consider everything together, including the parts of the comparability that don't rise to the level of no material difference. We've shown that a jury could find this. I just don't see how you could say that there's not a material difference between Ramsey and these two. So you're not hearing Judge Carnes. Judge Carnes, with respect to convincing Mosaic, you don't have to do this in all material respect. You don't have to do substantially similar in all material respects or whatever the standard is. I wrote it. I can't remember what it said. You don't have to do that. Vague comparability might be good enough on the side of convincing Mosaic. So I think what Judge Carnes' objection is, and I share it, is that every time you get pushed on convincing Mosaic, you go back to McDonald-Douglas. I appreciate that. But if you look at the convincing Mosaic, shifting back to that argument, you're looking at a convincing Mosaic of multiple race-neutral events. I don't see how you can take a bunch of, you know, workplace grievances that are on their face race-neutral. There's no objective component that could arguably be construed to be racist in any of those. How would you take those which add up to race-neutral to create a convincing Mosaic that anything other than race-neutral activity occurred? Even when you look at the events of their testing and arguably, you know, in their favor of the termination, they were the two that were accused of smoking marijuana on the job that day, not Ramsey. So if you look at all the facts, it just doesn't add up to create a convincing Mosaic. If you look at all the facts and not just the... Well, let me address this because this is kind of lost in the briefing and maybe I'm wrong about this, but one of the things that I thought was part of the convincing Mosaic was that they were replaced by white employees. Am I right about that? I don't know that to be the case. I don't know that they, it took so long to replace him. I don't know who actually replaced him.  I've got this in my notes. The next worker Colbett hired was Michael Morris, a white employee. He was a former employee hired as an operator. So in answer to Judge Brasher's question, the answer is yes. Maybe your point is it's not really clear enough on that to be a part of the convincing Mosaic. It seems like convincing Mosaic, they've got some stuff that they say was racist and you say was just complaints. They've got this incident where there's three people who were fired on the same day, two black people, one white person. The white person was hired back. And I guess that's really it for convincing Mosaic. I mean, that's the only thing I would view it as and I think when you look at that, even in the convincing Mosaic landscape, I think while you may not have to show exact... You have to look at who those people were. I mean, you get to just ignore the fact that he had more tenure, more experience, a different job title, more pay, all the things and say, well, that creates a convincing Mosaic. He was not accused of smoking marijuana that day. Is that not part of the analysis? Just to circle back to Morris, wasn't Morris fired for smoking pot on the job? Morris was fired. What happened there was before these employees were hired, four employees were accused, two African-Americans refused the test and they were fired. Morris took the test, failed, was fired, and a white employee passed. Morris came back eight months later, reapplied, went through the whole employment process, passed the drug test, but during that eight-month period, he had worked for another employer as an operator and so he had much more experience and so the decision was to allow him to come back, but as long as he passed all the drug tests and all that. But he came back in a really completely different capacity eight months later. I mean, my sense for all of this argumentation is that you might win before a jury. You might convince them that you've got the better story to tell and it seems to me there are two stories to tell. Well, our argument that the court got it right is that they have the burden to survive summary judgment. In order to do that, they have to put forth enough objective evidence of discrimination to meet at least some standard. If they don't meet McDonnell Douglas, even on the convincing mosaic, I don't think you can add up all these race-neutral events and argue, oh, I've been discriminated against. I mean, that would open the door to any person who'd been aggrieved if I just come up with a string of grievances that I could claim I have been discriminated against, even though they're all, if you look at them individually, are all objectively race-neutral. The point of the mosaic, though, is that you can't be up on it like this. You've seen Ferris Bueller. You've got to step back. That's not a mosaic. I understand, but would there be at least one incidence of a racially-tinged thing? Like, for example, in times there were emails, there were statements about African-Americans, things like that. Like, if you look at the cases since Lewis, those cases all had more evidence of a racially-tinged motivation for the decision-maker's process. I listened to the Jenkins versus Nell on the way down here. In that case, you had multiple other employees, African-Americans, testifying against the African-American supervisor that he made racist comments, that he referred to the white employees as having a Klan meeting, things like that. There's no evidence of that in here, and I made a very careful point to press them in deposition to make sure I drew out everything that they claimed occurred that was racially-motivated or racist, and they had nothing. I thought there was some evidence that they had been called boy on one or more occasions. I don't think that that is in the record, because when I pressed him specifically about that event, the day of the truck washing, I asked him specifically, and he said no. You don't think that's in the record? In other words, there is no evidence? I know that in one of the briefs there was a mention of that, but when I went back and looked at Hughes' deposition and Hall's deposition, I did not see that. Okay, so a short way to say that is there's nothing in the record to support that. I don't think there is. So if they had one incident of that, does that one incident create a convincing mosaic of motivation from we don't know who said it? No, you consider it with other things. Let me ask you to go back. I'm not sure I understood. Maybe I'm just uncomfortable with how we should handle it one way or the other. Ramsey got paid for a full day. They got paid for a half day because he got rehired and they didn't? I assume so. He came back the next day. Why does the fact that they cut you some slack, you walked off, said I'm not taking it, to heck with you. Why does the fact that he gets hired back and gets that break entitle him to a half day more pay than they got? Well, our argument would be that they were given that opportunity and they declined it. I understand, but I for one, that's a classic jury issue. They say they weren't. He says they were. He or they say they were. It's conflict. Can't both be true. That's why we have juries. And if that is the case, if a jury could find that they weren't given the opportunity to come back, then how can you justify him getting a half day pay more than they got? The only justification was he never stopped being an employee. He came that afternoon to ask for his job back. He was given his job back. They fired him. He left the job site, went straight to the office. He talked to his supervisor, went straight to the office and asked the ownership if he could come back the very same day. He never really left. He didn't go home and then come back the next day. He went straight to the office to beg for his job back. So he was still around while they paid him the full day. So he was absent without official leave. Is that what you're saying? No, sir. He basically was turned in his resignation, but then asked immediately for his job back. When he refused the test, he effectively resigned and he knew that. He never left the job site. Mr. Williams testified he came up to him and said, I can't lose my job. And he said, it's not my decision. You'll have to talk to somebody higher than me. So he went straight over to the office to talk to the ownership. It's a different location. He had to drive over there, but he talked to the office. They met about it and allowed him to return under those conditions that very same day. So we don't even have that he was treated equally and fired the way they were. He resigned just like they did by refusing to take the test. Yes, he did. The difference was that very day, he went immediately to the office to seek to get his job back. And they agreed. I understand. And then I know he gets money after that because we say we did offer them that opportunity. Mr. Pate did have that conversation and they say that they did not. We just believe that Judge Kugler's decision should be affirmed because if you add all of these incidents up, there's nothing objectively racist about any of them. And even if the court is correct that there is one reference to the boy comment, the court has multiple cases where there's much more severe activity on the workplace that they felt was not sufficient and pervasive enough to warrant the case going to a jury. On racial harassment. Yes. That's a different claim. Different claim. Okay, thank you very much. I would like to ask, have you all ever sat down and said, blessed are the peacemakers, can we work this thing out? We've had discussions. You need to have some more because it's very early in the case. Your client, if we rule against you, looking at a lot more expenses. And they are looking at a lot less recovery. And, you know, there's no cowardice or anything. Sometimes it takes courage to agree and mediate and that sort of thing. And I feel like I can speak for, I'm just talking for me now, but I feel like I can speak for the whole court. Y'all got a right to a decision. We'll sure give you one. But you need to decide if that's the best interest of your client to push for a decision in whatever may come after the decision or not come as the case may be. That's my two cents worth. That's actually a nickel's worth. Very well. Thank you so much. We've got three minutes of rebuttal, Ms. McGinley. Would you mind, as part of your three minutes, clarifying the record with respect to the boy? Yes, Your Honor. And I would say that is part of the record. In fact, the district court also recognized that it was part of the record. The district court mentions it on page three of its decision. And the testimony that the district court is referring to, I believe it was Eddie Hughes who testified specifically about that. And with all due respect to Mr. Smith, I believe there were several instances where his report of the record is certainly, from plaintiff's perspective, in the light most favorable to the defendants. I have several instances down here. Michael Morris, for example, who I did not bring up as a comparator under McDonnell Douglas, but I did bring up as a part of my convincing mosaic, was rehired, I believe the testimony is from Willie Williams, as a laborer. About a year later, maybe some time later, he moved up to the position of operator, but he was rehired as a laborer. And he also was rehired only a couple weeks after the, or three weeks after the plaintiffs were fired. So I think it's a lot closer in time, much closer to be a replacement. We also had information from a document that was an employee record, and the next laborer hired after Michael Morris was also white. He wasn't hired until several months after that, but he was also white. And I do think that that is evidence from which a jury could infer discrimination. Another point that I had made a note of was Mr. Williams' response to the plaintiffs' complaints of discrimination, when they called their acting supervisor, James Toxey, racist. There's testimony that Williams' reaction was to say, stop talking, and then split everybody up. Later, Willie Williams testified that he went back and talked to James Toxey about what happened. And Toxey said, it was nothing. It was nothing. Williams testified that he did not follow up with the plaintiffs. So it wasn't as if there was a chance for plaintiffs to say something about it. They were told to go to work. They split up. Willie Williams never addressed it with them. And after that, Eddie Hughes was out for COVID for two weeks. Hall was at work. But then immediately after Hughes returned is when they were both terminated. I think the other point that I would like to make is that this court has said, repeated the holding from Reeves v. Sanderson Plumbing fairly recently, that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, will not always be enough to support a finding of unlawful discrimination. But in some cases, it is. And I think here is a very good example of a situation that must go to a jury. There's just too many disputes of material fact. Okay, very well. Thank you so much. That case is submitted and will be in recess until tomorrow morning at 9 a.m.